Nat Lewis v. Commissioner. Nat Lewis and Harriett Lewis v. Commissioner.
Lewis v. Commissioner
Docket Nos. 47440, 47441.
United States Tax Court
T.C. Memo 1954-233; 1954 Tax Ct. Memo LEXIS 9; 13 T.C.M. (CCH) 1167; T.C.M. (RIA) 54339; December 27, 1954, Filed *9 Charles H. Burton, Esq., for the petitioners. William Fallon, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: These proceedings involve deficiencies in income tax for 1949 and 1950 and a penalty for 1950 as follows: Penalties
Docket
De-
Sec.
No.
Petitioner
Year
ficiency
294(d)
47440
Nat Lewis
1949
$932.32
47441
Nat Lewis and
Harriett Lewis
1950
908.42
$145.35
The issues raised by the amended petitions involve deductibility of certain amounts for traveling expenses, consisting of meals and lodging, depreciation, and casualty losses, and penalties imposed under section 294(d) of the Internal Revenue Code of 1939. In his answer to the amended petitions, as amended, respondent alleged that excessive allowances were made for depreciation on a truck and claimed increased deficiencies. Findings of Fact Petitioner Nat Lewis, hereinafter referred to as the petitioner, was married to Marsha Lewis during 1949 and thereafter until January 1950, when they were divorced. In February 1950 petitioner was married to Harriett Lewis, the other petitioner in Docket No. 47441. Petitioners *10 were husband and wife throughout the remainder of 1950. The income tax return of petitioner for 1949 was filed with the collector of internal revenue at Oakland, California. The joint income tax return of petitioners for 1950 was filed with the collector of internal revenue at Springfield, Illinois. Prior to and during the taxable years petitioner was employed as master of ceremonies for the eastern unit [1] of a circus operated by Polack Bros. Circus, hereinafter referred to as Polack. The written employment contract he had with Polack provided for payment of a salary only for the days the show worked. His compensation on that basis was paid at the close of each engagement in a city. In addition thereto he received an allowance of two cents a mile for transportation. He also received a commission on sales of candy. The eastern unit of Polack gave performances in 59 different communities during the period January 6, 1949, to December 8, 1949, and performances in 49 different communities during the period January 15, 1950, to November 18, 1950. From about the end of 1947 until August 1950 petitioner had a mailing *11 address at the home of his very good friends, Mr. and Mrs. James Ambrose, who resided at 615 Central Avenue, Alameda, California, until some undisclosed time in 1949, when they moved to 23598 Thelma Street, Hayward, California. Petitioner did not make any payments to the Ambroses for accommodations at their Central Avenue home and kept nothing of value at the place. He stayed with the Ambroses at the Central Avenue address when in California while the circus was not on tour. On September 9, 1950, petitioner entered into a contract for the purchase of a house at 14229 Califa Street, Van Nuys, California. Petitioner did not move into the house until about the end of November 1950. He did not occupy the premises at any time during 1950 while the circus was on tour. The purchase of the house was not completed until December 1950, or January 1951. Petitioner has paid the cost of maintenance of the house since September 1, 1950. Prior to 1949 it was the practice of petitioner to go to the home of the Ambroses in California at the close of each circus season and remain there until time to join the next tour of the circus. Petitioner scouted circus acts when in California but received *12 no compensation for it. At the end of the 1949 tour of the circus on December 8 petitioner went to Chicago, Illinois, to confer with officials of Polack and to obtain a divorce from his then wife. Petitioner remained in Chicago for a month. After taking a short vacation, during which he assisted the western unit of Polack in arranging its program for the next season, petitioner joined the eastern unit of the circus for its opening date in Saginaw, Michigan, on January 15, 1950. While carrying out his duties as an employee of Polack petitioner stayed at hotels and motels in various cities where the circus performed during the periods from January 6, 1949, to April 18, 1949, and from May 18 to December 8, 1949, and from January 15, 1950, to August 3, 1950. At all other times when on tour with the circus petitioner stayed, with a few exceptions, in his own trailer. Marsha Lewis traveled with petitioner at all times until she left him. Petitioner Harriett Lewis accompanied him throughout the 1950 season of the circus. Petitioner gave Chicago as his address at many of the hotels at which he stayed. He ate his meals at restaurants in the cities where the circus showed. In the fall of *13 1947 petitioner purchased a used trailer for $1,700. He used the trailer for lodging from April 18, 1949, until May 15, 1949. The trailer had a useful life of four years from the time of its acquisition. Petitioner purchased a Dodge truck in April 1948 for $1,900. He used the truck for transportation in the performance of his duties with the circus from January 6, 1949, to May 15, 1949, and to pull the trailer from April 18, 1949, to May 15, 1949. The truck and trailer were totally demolished in a road accident on May 15, 1949. Petitioner recovered $1,195 from an insurance company for loss of the truck. Nothing was recovered by him for the loss of the trailer. On May 18, 1949, petitioner purchased a new Oldsmobile automobile at a cost of $3,800. He used the automobile for transportation in the performance of his duties with the circus from the date of purchase until the close of the 1949 circus season, and during the entire tour of the circus in 1950. During the early part of 1952 petitioner received $1,200 for the automobile as a trade-in for a 1952 Oldsmobile automobile. The old car had an estimated life of four years. On August 3, 1950, petitioner purchased a trailer for $2,600 *14 and thereafter to November 18, 1950, used it for lodging while in the performance of his duties as an employee of the circus. The trailer had an estimated life of four years. The income tax return filed by petitioner each taxable year claimed the net amount of $1,300 ($1,700 less reimbursement of $400 by the circus) for automobile expense in business, including $475 for depreciation on the Dodge truck. The returns contained deductions of $5,541 and $6,110, respectively, including $4,771 and $5,280 for meals and lodging, for traveling expenses for 330 days. No deductions were claimed in the returns for depreciation on the Oldsmobile or trailers, or for losses sustained on the Dodge and trailer as the result of the accident on May 15, 1949. The returns filed by the petitioner for the taxable years were prepared by the secretary of the western unit of Polack, based upon information appearing in returns for prior years and estimates made by her of petitioner's traveling expenses. Petitioner filed the returns as prepared for him without reading them or checking them for accuracy. In his determination of the deficiencies respondent disallowed the amounts claimed in the returns for *15 meals and lodging and allowed the deductions taken for automobile expense, including depreciation on the Dodge truck. He also determined penalties of $90.82 and $54.51 for 1950 under section 294(d)(1)(A) and (d)(2) of the Internal Revenue Code of 1939, respectively. Opinion The primary issue is whether the amounts claimed by the petitioner each year for meals and lodging, and disallowed by the respondent in his determination of the deficiencies, are deductible as traveling expenses "while away from home in the pursuit of a trade or business," within the meaning of section 23(a)(1)(A) of the Internal Revenue Code of 1939. Aside from the matter of proof of the amount expended, the parties differ only on the question of whether the expenses were paid "while away from home." Petitioner contends that his home for the purposes of the statute was with the Ambroses in California, or, in the alternative, at Chicago, the home office of Polack. Respondent contends that petitioner's home was wherever he happened to be with the eastern unit of the circus and, consequently, the cost of meals and lodging was a personal expense. The home of a taxpayer for the purposes of the statute "means *16 his place of business, employment, or post or station at which he is employed. Commissioner v. Flowers, 326 U.S. 465; Moses Mitnick, 13 T.C. 1; Walter M. Priddy, 43 B.T.A. 18; Mort L. Bixler, 5 B.T.A. 1181." Raymond E. Kershner, 14 T.C. 168, 174. See also Harold R. Johnson, 17 T.C. 1261; Frank N. Smith, 21 T.C. 991; Wilson John Fisher, 23 T.C. , (Nov. 9, 1954). It is apparent that petitioner's home was not in California. He used the home of the Ambroses, first in Alameda and then in Hayward, as a permanent mailing address, and stayed with them without cost as their guest between tours of the circus prior to the taxable years. He kept nothing of value at the addresses and did not go to the home of the Ambroses at the close of the 1949 circus season. Petitioner entered into a contract in August 1950 to purchase a residence in Van Nuys, California, but did not commence to occupy it until after the close of the 1950 tour of the circus in November, or complete the purchase until December of that year or January 1951. It was not, therefore, more than a prospective home for petitioner while he was *17 on duty with the circus in 1950. Petitioner had no duties to perform in California as an employee of Polack. All of his activities, as such, were confined to work while the show was on tour in the eastern section of the United States for about 11 months in 1949 and 10 months in 1950. Petitioner's place of employment was none other than the various places the show performed during the years involved. In Moses Mitnick, 13 T.C. 1, the taxpayer managed theatrical shows while on tour for 43 weeks in 1943 and 17 weeks in 1944, and, like the petitioner here, had no permanent place of residence and no business headquarters. We held, under the circumstances, that his "home" was "wherever a particular show he managed happened to be." A like conclusion was reached from the facts in Wilson John Fisher, supra, involving a professional musician who performed as a soloist for short periods in various cities. See also Charles E. Duncan, 17 B.T.A. 1088. Petitioner relies heavily on Charles G. Gustafson, 3 T.C. 998. There we concluded from the evidence that the taxpayer's "home" was with his sister in Greenville and that his "home office" was the headquarters *18 of his employer in Des Moines, both in Iowa, to which he returned for home or busines reasons. Similar facts are not present here. In E. G. Leach, 12 T.C. 20, another case on which petitioner places much reliance, the taxpayer actually maintained a home for his wife and child and could not take them with him to places of employment because of the temporary nature of his work and unavailability of accommodations for them. Here, petitioner had no place of business, or employment, post or station other than the various cities in which the circus performed while on tour. It follows that his cost of meals and lodging was a nondeductible personal expense, as determined by the respondent. Petitioner is claiming depreciation on the Dodge truck, Oldsmobile automobile, and trailers as property used in his trade or business. Dodge Truck Petitioner claimed depreciation each year on this truck in the amount of $475, all of which was allowed by respondent. The parties are now in agreement that depreciation is allowable on the asset at the rate claimed only for the period to May 15, 1949, when it was totally demolished in a road accident. Oldsmobile Automobile The only *19 difference between the parties under the issue is the useful life of the asset. Petitioner contends that the automobile had a useful life of three years and respondent insists that depreciation should be at the rate of 25 per cent per year, the rate used for the Dodge truck. There is no direct testimony on the life of the automobile. It was purchased new May 18, 1949, and although petitioner testified that it was completely worn out at the beginning of 1952, within a few months thereafter he received an allowance of $1,200 for it on a trade-in for a 1952 Oldsmobile. A reasonable estimate of the life of the asset is four years and depreciation is deductible on that basis. Trailers The primary difference between the parties on this issue is whether the property was used in his trade or business or used for the production of income. Petitioner's position is that since his home was in California and the trailers were used for lodging accommodations in the performance of his work for Polack, the property was used for business purposes. The view of respondent, with which we agree, is that the trailers were the personal residence at each location where they were used while the circus *20 was on tour. Having concluded that instead of California, the home of petitioner, under the statute, for deduction of traveling expenses was the various cities at which the circus gave exhibitions while on tour, the issue turns on whether there is any material distinction between the use of public places for lodging and a privately owned trailer. For reasons not disclosed by him, petitioner preferred to use, in proper season, a trailer for lodging over other accommodations where he stopped overnight. The cost of maintaining the trailers was in lieu of the expense of other lodging accommodations. The cost of lodging at public places was a nondeductible personal expense of petitioner and his choice of a trailer for sleeping quarters does not change the result. Accordingly, petitioner is not entitled to deductions for depreciation on the trailers. Concerning deductions for loss of the Dodge truck and trailer in 1949, respondent contends only that the evidence is insufficient to establish the amount of loss sustained. No amount was claimed in the return as a deduction because of the casualty and, accordingly, the issue does not involve presumptive correctness of a determination by *21 the respondent against petitioner's claim. Petitioner's testimony on the time of acquisition and the cost of the assets, their useful life, the time and extent of the destruction of the property and the recovery made, is uncontradicted and, in our opinion, constitutes proof of the facts testified to as set out in our findings under the issue. The facts so found are sufficient for the parties to compute the amount of loss sustained on each asset for reflection in the computation under Rule 50. The remaining issue relates to penalties imposed for 1950 under section 294(d) for failure to file a declaration and for a substantial underestimate for estimated tax. Petitioner submitted no evidence under the issue and did not discuss it on brief. His only contention against the imposition of the penalties appears in his amended petition, and that consists of an allegation that no declaration was filed because no tax was in fact due for that year. If the allegation is not an admission that the penalties attach to any tax due, lack of any evidence of proof of error would require us to hold for the respondent. Accordingly, we sustain the respondent on this issue. Decisions will be entered *22 under Rule 50. Footnotes
1. It also operated another unit, known as the western unit.↩